# CASES

## ARGUED AND DETERMINED

### IN THE

## SUPREME COURT

### OF THE

## STATE OF LOUISIANA.

—◦✦◦—

### WESTERN DISTRICT, AUGUST TERM, 1824.

—◦✦◦—

### THE STATE vs. BELL.

MARTIN, J. delivered the opinion of the court. The defendant, clerk of the district court, for the parish of St. Landry, is before us, on a rule to shew cause why he should not be dismissed from office, for a breach of good behaviour, in procuring the means of producing an abortion.

The rule was issued, on the production of his own deposition, that of a physician he applied to for, and who furnished, those means, and that of a coloured woman, who received from the defendant, and carried to the deluded

THE STATE
vs.
BELL.

female, an instrument, by the use of which her premature delivery was to be obtained. These depositions were taken, under the inspection of the attorney, who prosecutes for the state in the district, as the basis of a prosecution, against the parents, for an incest; they being related in a very near degree.

The defendant has denied the charge. The doctor's deposition has been read, on the hearing, with the consent of the defendant's counsel. The colored woman was examined in open court, and the attorney for the state has permitted the defendant's own deposition to be read.

The doctor deposed that, being applied to by the defendant to furnish or indicate the means of producing the abortion, he at first declined: but afterwards said that, on being paid, he would indicate the means. The defendant replied, this would do, as the coloured woman would be employed to put them in use and the father and mother would gladly pay any sum for her instant relief. The defendant pressed for an immediate disclosure of the means; but the doctor declined gratifying him, unless he was previously paid. The inability of the parties for the present was urged,

as well in their readiness to give a note, and
their ability to take it up, when they sold their
beeves.   On this, the sum of seven thousand
dollars was mentioned, by the doctor, as the
compensation he should expect.    After some
observations on the magnitude of the claim,
the defendant promised to procure a note for
as large a sum as he could, and a few days
after produced one he had prepared, for four
thousand dollars, but not yet signed, which
was objected to on account of the smallness of
the sum.    The defendant offered his own note,
which was also refused.—On his observing that
the father was gone to the Attakapas, the doc-
tor said the mother could give her own note.
The defendant replied, no light could be made
in the house, after the colored woman got ac-
cess to her, and he urged that every reliance
could be had in the family.    The doctor de-
clared his determination to decline acting, un-
less he received a note.    The defendant said
he would not do any thing in the matter, and
would wash his hands of it.    The doctor an-
swered he would do well, for the person who
would procure the abortion would commit
murder.

On another day, the defendant told the doc-

tor, the mother had threatened to destroy herself, unless she was immediately relieved ; he repeated that great confidence might be placed in the family, and again tendered his own note.    The doctor, declining to accept it, urged the necessity of his having, besides a good note, a sum of five hundred dollars in cash, in case the matter was discovered.    He was answered, this could be had, but that, in case of a discovery, the defendant alone should suffer, and not he, whose name should be kept secret. On the following day, the defendant shewed him the father's letter and note for five thousand dollars, pressed him no longer to disappoint his hopes, and added the mother threatened to destroy herself by jumping into the well.    The doctor said he would try to get something to prevent that.    He never had the note in his possession ; he believes it was payable to the defendant.    In the evening, being again urged, he said he would procure something, if not to produce the abortion, at least to prevent the woman killing herself. Before supper, he handed an instrument to the defendant, giving him directions, as to the manner, in which it was to be used, apprising him of the danger there was of the mother be-

ing killed with it; mentioned his apprehen-
sion of the coloured woman being discover-
ed with it, or of her leaving it behind.  After
supper, he pressed the defendant, not to suffer
the colored woman to use the instrument, as
there was great danger of her killing the mo-
ther.  The colored woman was then in the
defendant's back room, and he assured him
she should not, as he had apprised her of the
danger.

The colored woman deposed she was sent
for by the young woman, who mentioned her
situation, and her determination of destroying
herself by jumping into the well, or in some
other way.  The deponent endeavoured to
dissuade her, and she mentioned the matter to
the defendant, who observed it was unfortu-
nate that some friend of the family did not
mention the matter to her mother, and being
pressed to do so, replied he was not sufficient-
ly acquainted with the family.  On this, the
deponent took it upon herself to mention his
name to the young person, as that of a man
disposed to befriend her.  She was desired,
if she thought him really so disposed, to tell
him, that she (the young person) threw her-
self on his mercy.  On receiving this message,

he expressed his displeasure at the mention of his name—asked what was meant by the expression " throwing herself on his mercy," and declared that, if the destruction of the child was intended, he would not have any thing to do with it, *for all the family possessed.* The young person, being pressed to express her intention, said her brother had seen in a book, that there were means of procuring an abortion, and she wished the aid of a physician for this purpose. This being repeated to the defendant, he repeated his asseveration, that he would not have any thing to do with it : but being assured of the determination of the young person to destroy herself, or the child, he said the best thing that could be done was to procure something from a doctor, (no matter what) that might prevent her resort to dangerous means ; and the deponent assured her, the defendant would see whether any thing could be done for her relief ; but, it was well understood between the defendant and the deponent that nothing, that could destroy the child, would be given.

The defendant soon after, informed the deponent, he had procured a doctor, whose name, though often pressed, he refused to disclose, adding that he and the doctor were determi-

ned that nothing should be given that could destroy the child. The doctor would only give some trifle. He informed her the doctor demanded twenty thousand dollars; observing he made this high demand, not wishing to give any thing. Two or three days after, he mentioned the doctor had reduced his demand to ten thousand dollars—she replied his asking so much, was a proof that his intentions were bad; but the defendant replied the doctor would not give any thing that might destroy the child.

The next night, towards twelve, the father came to the deponent for the thing the doctor had promised. She begged him to tell the young person, the best thing she could do, was to apprize her mother of her situation— that the old lady was the best doctor she could resort to. He replied this could not be done, and he was ready to purchase relief, at the expense of every thing he possessed. She then informed him of the doctor's demand, and he said he would give him five thousand dollars. This was communicated to the defendant, who said he had no objection to it; but he would have nothing to do with the destruction of the child. A few days after, he told

her the doctor would not do any thing, until he had a *note* for five thousand dollars—the defendant accordingly wrote one, and the deponent got it signed and brought it back.

The next day, she inquired from the defendant, what the doctor meant to give. He told her she must not use it, and on her repeating the inquiry, he declared he would neither tell, nor shew it to her, unless she promised not to suffer herself, by any means, to be prevailed on, to use it. She asked whether it was a potion, and was answered it was an instrument. It was now produced and put into her hands. The charge, not to use it herself, was repeated, and she was directed to tell the young person not to employ it—apprising her of the danger, with which the use of it would be attended. He requested that she might be advised to inform her mother of her situation, and if she determined on doing so, he requested that she might be informed he would prepare the draft of a letter for this purpose, which she might copy and hand to her mother, or leave it, where she could find it. On her going to the young person with the instrument, the defendant communicated to the deponent, the instructions the doctor had given him, as to the manner of using it.

West. District.
August, 1824.

THE STATE
vs.
BELL.

The account given by the defendant, in his own deposition, is as follows :

On communicating to the doctor, a letter from the father of the child, in which it was mentioned that " *if any thing could be procured from a doctor*, or if the young woman could be delivered, without the knowledge of her mother, all would yet go well," the defendant asked whether something could not be *given*, something *done*, to assist them—some kind of medicine, no matter how simple, giving it a high sounding name, to content, give time and get them off. The doctor, at first declined doing any thing : but promised to think about it. The next day, he expressed his readiness to assist, urged the danger he should place himself in, and his determination not to do any thing, unless he was well paid. Pressed to state the sum he should expect, he said twenty thousand dollars; he, however reduced his pretensions to ten, then eight thousand, to be secured by a note of the father. This being communicated to the latter, he expressed his determination to sacrifice all his property, and finally offered a note for four thousand dollars. The doctor objected to the smallness of the sum, the defendant sent one of five thousand

THE STATE
*vs.*
BELL.

dollars, for the father's signature, observing that, on its being returned signed, *the things would be furnished,* and would take effect, *if not immediately, at least within twenty-four hours.* On the return of the note, duly signed, the doctor handed to the defendant, *an elastic catheter,* directing him how it was to be managed, and warning him of the danger attending its use. The defendant, on the same night, handed the instrument to the coloured woman, with the directions and caution, with which the doctor had accompanied it, required her promise not to use it, and on receiving it handed the instrument to her. While the defendant was giving these directions to the woman, the doctor returned, took him aside, and repeated his request that she should be well apprised of the danger, attending the use of the instrument, and cautioned him not to employ it, *unless he was sure.* Both the doctor and the defendant repeated their wish, that the instrument might not be used ; but suffered the coloured woman to carry it away. In the morning, she brought it back, declaring it had not been made use of, and she had left the young person, in great distress, at its failure.

Dr. Dixon deposed that the instrument,

described to him, as that furnished to the defendant, is not such a one as could be used to produce an abortion. The instrument described is a flexible catheter. He does not know whether there be *any* instrument proper to produce an abortion. He does not know that a flexible catheter could produce it; its use is to draw urine from the bladder.

Several witnesses deposed to the defendant's good character. Others were offered to testify that, *in their opinion*, the defendant continued to be a proper person to fill his office; but we were of opinion the latter witnesses could not be heard.

In the determination of this case, the first question, which is to be solved, is one of fact. Did the defendant procure the means of producing an abortion?

In our search for the truth, we surely do no injury to the accused, if we first attempt to elicit it, out of his own deposition, which the indulgence of the prosecutor for the state, has permitted him to avail himself of.

He begins by informing us he communicated to the doctor, a letter from the reputed father of the child, mentioning that "if *any thing* could be procured from a doctor, or if

West. District
August, 1824.

THE STATE
vs.
BELL.

the young person could be delivered, without the knowledge of the mother, all would yet go well;" he then enquired " whether any kind of medicine, no matter how simple, giving it a high sounding name, could not be had to content the parties, give time and get them off."

There is a vast difference between what is called for in the letter, and what the doctor was apparently desired to furnish—the letter called for something that might have the same effect as a secret delivery—so that all things might yet go *well*—evidently the means of an abortion. The doctor was called upon for some *simple* (we conclude *harmless*) medicine, by which the parties might be *amused.*

It is clear, however, the doctor understood the defendant was in search of the means of producing an abortion, not of a simple medicine, with a high sounding name. For, after having at first declared his intention not to comply, he promised to think about it. If he had understood that a harmless potion, made apparently potent, by giving it colour and odour, was all that was expected, there could have been no ground for hesitation or caution. When he afterwards intimated a change of

disposition, he laid before the defendant the

great risk he ran in acceding to his proposal, and required a large sum, twenty thousand dollars, as a compensation for that risk. Now had it not been the intention of the defendant, to be understood, in the sense, in which he evidently was, would he not immediately have said his meaning had been mistaken, and he had proposed nothing dangerous, because he had proposed nothing criminal. His reply shews his impression, that he had been understood in the sense in which he wished to be; that which he wanted was not a *simple* medicine, with a *high sounding* name; but a *very potent* one, that might produce the like effect, as the secret delivery of the woman, *i.* e. the means of producing the abortion. He admits the danger attending a compliance with his request, and only complains that the chances of this danger have not been correctly calculated and induces the doctor to reduce the sum, by which he expected it to be compensated, to one fourth.

The deposition next shews that these arrangements being made, the defendant informed his employer of his success—adding that the compensation being secured " the things

West. District. would be furnished?" What things? The
*August,* 1824. simple medicine, with a *high sounding name?*
THE STATE  No: *things* which take effect, if not immedi-
    *vs.*   ately, at least within twenty four hours. What
BELL.  effect? That of which his employer spoke, in
his letter, communicated to the doctor, i. e. the
things would go as well, as if the young per-
son was delivered, without the knowledge of
her mother.

The compensation being secured by a note
of $5000, the deposition states, the doctor
furnished the thing asked ; not a simple medi-
cine, with a high sounding name, but the
means of producing the abortion—an instru-
ment of *death.*

It is true the deposition states there was no
intention, either in the defendant, or in the
doctor, that it should be employed. Yet, the de-
fendant swears he received it from the doctor,
in order to deliver it to the coloured woman,
with directions to be communicated to her as
to the manner of using it. He was charged
to inform her of the danger, the mother of the
child would run of losing her life. With these
directions and this caution, she received an
injunction, (and a solemn promise was exac-
ted from her) not to use it. Could she think

West. District.
*August*, 1824.

THE STATE
*vs.*
BELL.

the defendant seriously expected her attention to this injunction, when it was accompanied with the delivery of the instrument, and she was instructed how to use it, in such a manner as not to endanger the mother's life.

Attending more, as we are bound to do, to what the defendant *did,* than what he *said*, his deposition is alone sufficient to convict him ; and the court may well tell him *ex ore tuo, te judico.*

The doctor's deposition, however, places the affair, in a stronger light. He told the defendant he would *indicate* the means. The reply was this would suffice, as the coloured woman would be employed to use them. The doctor added the person who would use the means he was about to indicate, would commit *murder*—and he ran such a danger, by the mere indication of them, that should his agency become known, he could find no safety but in flight—that therefore the means would not be indicated, until several thousand dollars were secured, as his compensation for this risk, and five hundred dollars provided, to enable him to fly. Surely, when, after this, the defendant proceeded to make arrangements for securing the large sum, and providing the

lesser, in case of necessity, his conduct precludes the idea, he believed that none but *innocent* means were to be indicated.

It is true that if implicit credit be given to the testimony of the coloured woman, and to the solemn and repeated asseverations of the defendant's determination of using no means, tending to the destruction, which she places in the defendant's mouth, we might perhaps arrive at a different conclusion. But admitting these asseverations were made, the defendant's *actions* contradict his *words*, and the means he resorted to, evidently denote quite a different determination, than that which is so forcibly and so frequently asserted.

She avers the defendant did not give her any instruction, as to the mode of using the instrument, until the morning, when she brought it back. But, he swears expressly he gave the directions, in the evening, when he placed the instrument in her hands.

Upon the whole, we are of opinion that the testimony establishes, beyond doubt, the fact that the defendant did procure the means of producing an abortion.

The question of fact being thus disposed of, that of law remains to be solved.

" The clerks of the several courts of this state shall be removable for *breach of good behaviour.*"   *Const.*

That the fact charged and proved, constitutes a breach of good behaviour, is so obvious a proposition, that we cannot seriously adduce any argument, in support of it.   Whether such a breach of good behaviour, be one of those for which a clerk ought to be removed, is a question, which it is now our duty to examine.

It is certainly true that *every* breach of good behaviour, does not require, or even authorise the removal of a clerk.   Every *indictable* offence (being the commission of an act, forbidden by law,) is a breach of good behaviour. As no words, however abusive, justify a battery, it follows that a clerk who would knock down a person, who gave him gross verbal abuse, would be guilty of an indictable offence, and consequently of a breach of good behavour.   Yet no one would say such a breach would authorise his removal.   The reason is that, although no man ought to be allowed, in civil society, to avenge his own wrongs, few men have, at all times, such a command over their passions, as patiently to bear gross abuse,

West. District
August, 1824.

THE STATE
vs.
BELL.

until the tardy march of justice overtake the wrongdoer, and if the citizens, who have no such extraordinary patience, were to be excluded from office, the circle, within which a choice is to be made, would be alarmingly lessened.

It is also clear that the breach of behaviour, for which a clerk is to be removed, needs not to be a breach of *official* good behaviour, i. e. *a misdemeanor in* OFFICE ; because such misdemeanors are enunciatively mentioned in the constitution, as the grounds of removal of *all* civil officers, except clerks, and the use of a more comprehensive expression as to them, *a breach of good behaviour*, is evidence of an intention of enlarging the circle.

We conclude that the expressions, under consideration, cannot be confined to *official* or *legal* misdemeanors. A gross breach of *moral* good behaviour, (unequivocally evincing an absolute dereliction of principles, the extinction of the moral sense or the absence of that integrity of mind, without which one cannot hope to enjoy public confidence,) satisfies the words of the constitution.

We even think that an act, positively authorised by law, might constitute such a mis-

behaviour, as would call for the removal of certain officers. In the city of New-Orleans, a certain number of gaming houses are *licensed*, under an act of the state legislature. Individuals may, by the purchase of a license for this purpose, at the treasury, acquire the right of keeping such a house. Yet the exercise of this right could not be attended with impunity in a judge. Suitors would feel alarmed and insecure, in seeing him pass from the nightly orgies of a gaming table, into the very sanctuary of the justice of his country; and there can be no doubt that those, whose duty, it would be to calm these alarms, would not long hesitate in concluding that his conduct was such a breach of good behaviour, as loudly demanded his removal from office.

We are aware we give a very great latitude to our discretion; but we are unable to see how it could safely be narrowed. If clerks are removable for causes, which the constitution has not clearly defined, and left vague and uncertain, they are not placed in a worse situation, than the other civil officers of the state, except the governor, who is removable for a misdemeanor in office, only. The judges are removable for a *reasonable* cause. All

West. District. other officers are so, at the discretion of two
August, 1824. thirds of both houses of the legislature, who
THE STATE   are not bound to give any reason for the re-
vs.
BELL.        moval.

The constitution has provided for the security and independence of clerks, in the elevated tribunal, to whom alone they are amenable ; in the number of its members, sufficiently large to afford protection against private ani_mosity and pique—not sufficiently so to check responsibility—in the obligation imposed on them, to adduce the reasons that direct their judgment,—in the publicity of the trial and the liability of the judges, to be, in their turn, judged.

Having examined the question in a general point of view, we now approach it on the particular.

An incest was committed ; the parties sought by the destruction of the fruit of their criminal intercourse, the removal of the evidence of it from the eye of the officers of justice and the public. A *moral* murder was intended. The defendant, an important officer of the court, before whom they were amenable, undertook to provide the means of carrying the nefarious deed into execution ; he induced by

West.District.
*August*, 1824.

THE STATE
*vs.*
BELL.

the temptation of lucre, a medical man to forget what he owed to his profession, his country, and his God,—to furnish the deadly weapon— to instruct him in the use of it. He gave this weapon, and the instructions he had received to the person, who had been employed, as the immediate agent, in the destruction of the child.

If, after this, the seducer be brought to the bar, will not the bye-standers shudder, when they hear the defendant arraign him? Considering the important part the defendant must take in the trial, what hope, what security can there be for his impartial conduct? If suspicion will have once been excited, when will it subside?

All those who minister, in the temple of justice, from the highest to the lowest, should be above reproach or suspicion. None should serve at its altar, whose conduct is at variance, with his obligations. Surely he, who can give his aid and sympathy, to screen offenders, should not be trusted to take any agency in their prosecution.

It is therefore ordered, adjudged and decreed, that the defendant be removed from the office of clerk of the district court, for the

THE STATE
*vs.*
BELL.

parish of St. Landry—that he pay the costs of the prosecution ; and that the clerk of this court, transmit a copy of this judgment, to the judge of the fifth district.

*Lesassier* for the state, *Brownson* for the defendant.*

---

*The cases of this term are continued in the next volume.